v. Holzer Health Systems, Ardent Health Procedures, and Medicare-For-That. Mr. Grosso, over to you. May it please the Court. My name is Andrew Grosso, together with my co-counsel, Mr. Danny Cordill. We represent the appellant, Mrs. Sarah Jones-McNamara. This appeal from a decision from the Southern District of New York, which granted summary judgment to Holzer Health Systems on her claim for retaliation on the Federal False Claims Act. Mrs. McNamara was the Corporate Compliance Officer and the Vice President of Holzer when she identified ongoing kickbacks between Holzer and an ambulance company. What were the kickbacks? I'm mystified by that, counsel. There was a period of years, going back to at least 2006 and continuing into at least 2012, where Life Ambulance was receiving over 90% of all the referrals. If it wasn't established a kickback, there could be a hundred different reasons why that's true. But we have the testimony of Terry Paul and his wife, who also, Theresa Paul, William Paul and Theresa Paul, my apologies, who gave their affidavits, and they said the reason why Life Ambulance was providing free food and gifts was in order to get every single referral from Holzer. So that was the purpose. You mean this thing that says Life Ambulance will be providing hot dogs for the health, the employee health fair, is all it took to bribe somebody? It wasn't just that. They actually provided ski jackets. Well, were they ski jackets or just plastic jackets? But even if they were, were those given to anybody that had any power to determine whether or not Life Ambulance would... They were given to the nurses. They were embroidered with the nurses' names on them. Were they given to anybody that had the power to say what ambulance company would be used? Yes, the nurses. Is that in the record? Would you tell me? Yes, that is in the record. Where? It is in the affidavits of the Paws, and there's an email from Tina Baker discussing the gifts that were being given. Who's Tina Baker? She was one of the nurses at Holzer Medical Center. And she said, I have the duty of determining what ambulance company gets the business, and I got a jacket to do that. No, that was Mrs. McNamara. Mrs. McNamara, and she is in the position to direct the ambulance service. She conducted an investigation. I didn't ask that, Counsel. I ask, who said what nurse or doctor that received a jacket was in a position to say whether or not the ambulance company would get to work? Dr. McCunish was in charge of the emergency room, and he was in a position, and he received the jacket. The duty nurses were the people who chose... The doctor had the right to decide which ambulance would pick up somebody? They were in charge of choosing which ambulance would get the preferred provider contract. Okay, and that's unusual that administration wasn't involved, that an ER doctor was involved. But who says that? James Phillippe had the ultimate authority who to decide, but he had input from McCunish. Well, he had input, but that's a little different. I'm just trying to find out where, you know, the hot dog thing is nonsense, I think, and the jacket is your closest, I guess, if it went to somebody that was in a position to do something. Every single nurse and worker in the emergency room, as well as in other places in the hospital, were given... Every single nurse? Every nurse, according to the PAWS. According to whom? The PAWS, P-A-U-G-H. They have two affidavits in the record. And who is she? Or he? They were an emergency technician and an ambulance driver who worked for Life Ambulance. Between the two of them, they spanned the period 2006 to 2012. Did your client know about the PAWS information when she was employed by the hospital? No, but she was in the middle of an investigation, and she was talking to people in the emergency room and learning about this information when she was fired. So she did not... So your position is that you don't need to show that she actually knew that every person in the ER had received a jacket? That is correct. All she needed to know was that there was something that looked very much like a kickback, and she was in the process of investigating it, and she was trying to stop it. And because she was doing those things, she was fired. She had a good faith basis. One of the other reasons was they said don't put things in writing until you do just what you suggest, and that is complete your investigation. And you don't have to. And that is one of the errors that the district court made. The district court expressly adopted that defense. Well, but if she found nothing, then a lot of people get slandered, and I don't think it's unreasonable to say let's complete the investigation. The only persons to whom she sent those e-mails documenting her findings were to Mr. Brent Saunders. And they were the people that told her don't put it in writing until she finished. She's entitled to put it in writing. And they didn't tell her not to do the investigation. They said just don't put it in writing until you finish, which seems a pretty reasonable comment. Except for the fact that the Federal False Claims Act says a person is protected, cannot be fired if they engage in lawful conduct. But lawful conduct does not mean slandering somebody until you've got proof. She didn't include any names. But she did include life ambulance as being evidently the person that was doing the bribing. One, in order to do a proper investigation, in order to fulfill the position of a corporate compliance officer as well as do a proper investigation, one must be able to document one's findings as one progresses. Nobody told her not to. They just said don't send it through everybody so that other people can see it. Once you put it into e-mails and things like that, then it's open to the public. But the False Claims Act allows her to do that. It protects her from doing that. The conduct is any lawful acts in furtherance of efforts to stop a violation. We don't know if this was lawful or not. It could have been slander if she didn't find the stuff that she contends was there. And it was not just don't put it in e-mail. It was not just don't investigate. Don't put it in writing until you finish your investigation. Right. Let's conclude your investigation. In order to conclude an investigation, one must document as one is going along. In order to stop an ongoing violation. You're talking beyond each other, counsel. It is part and parcel of a corporate compliance officer's job to document. She was given the ultimate responsibility under her job description as to how she was to conduct her investigations. And Mr. Saunders, the CEO of Holzer, admitted that. Our expert, Mr. Greg Radinsky, specifies that the compliance program guidelines of Health and Human Services allows her to do that, and those guidelines were expressly adopted in the policy of Holzer Medical Center. I have to point out that what the district court found was that by not following Mr. Saunders' instructions, by putting her findings, her conclusions in writing before she completed her investigation, she had somehow taken herself out of the protections of the False Claims Act. And that's incorrect. Because one is allowed to put one's findings in writing. There are many, many cases, including cases in this court. McKenzie against Bell South. Mann against Heckler and Koch. Southern District of Ohio case. United States X-Rail Howard against Lockheed Martin. And McKenzie of this court cites Yossidian in the B.C. court. Yossidian against Howard University. All that say an employee is entitled and protected when he puts things in writing. I don't want to get too far on a tangent on this, but I don't think the argument is that she wasn't entitled to document. I don't think that the management was saying don't document. I think it was saying don't draw your conclusory statements and put them in writing until the investigation is done. That's a big difference. Documentation is a very important part of that job. Here's what I've found so far. But you've admitted she was in the middle of an investigation. And so from a management standpoint, you could see why it would be of concern to have an employee who has that compliance responsibility making conclusions in writing, which she would have a responsibility to do when the investigation is done, prematurely, and say, well, that's not a practice that we really think is a wise practice. Well, what happens if there's an ongoing violation, as there is here? And the only way to stop an ongoing violation is to let management know. First you've got to prove the violation comes. Not necessarily. One has a good faith basis. Well, what are you stopping if nobody has violated anything? Then the investigation is reversed. It was all stopped. Internally, the e-mails went only to senior management, only to three people. And furthermore, she had already concluded at that time that there were, in fact, violations. What she had not completed was the scope of the violations. They went back for six years. She didn't even know that at that point. No, she went back. She had concluded that they got hot dogs for six years. They got hot dogs. They got free foods, barbecue, twice a year, when nurses from the hospital wanted little hamburgers. When I was a lawyer defending hospitals, I was conducting bribes when I was taking the chief executive officer out to lunch. I don't think you were in a position to refer patients to them. No, but the chief executive officer was in a position as to whether I was going to be the lawyer or not. That's true, and I go out to lunch with potential clients also. The point that with regard to the scope of the kickbacks, they would make runs to Columbus, Ohio, from Galpolis, Ohio, to bring back craved cases from White Castle upon call. Whether it's a very small item or a very large item makes no difference. The factor is the inducement factor. If the purpose of giving a gift is to get a referral, that's a violation of the law. Indeed, it was a lot larger than Mrs. McNamara knew at the time, and Holger very well could have suffered significant liability, as demonstrated by the fact that Paul has brought a key tam against life ambulance. They could have named Holger in that also. What about the fact that there are about nine different bases for firing her that are asserted by Holger, and some of them may in fact be true? How do you deal with that? They weren't brought to her attention until after the litigation began. There are two evaluation forms that were prepared for Mrs. McNamara. One on June 1st, which was never shown to her. It's completely blank, but signed by Brent Saunders. The second one is dated and signed June 20th. It has no specifics whatsoever. During the meeting that she had on June 30th when she was fired, she was given no specifics as to why her performance was bad. The only time we found out what these supposed bases were were after the litigation began. Indeed, with the exception of two items. One, that she was putting things in writing before she, quote-unquote, completed her investigation, and two, that she was having trouble remembering Mr. I take that back, that she was having trouble with Lisa Haley, who was the one who was actually facilitating these kickbacks prior and afterwards. There was absolutely no reference until discovery in this case a few years later. So this is protectual. It is quite clear that what Holzer was doing, they made the decision on May 19th that they were going to fire her because she insisted on putting things in writing. Your red light is on, so thank you very much. May it please the Court, Bill Proffitt on behalf of the Appalachian-Holzer Health System. I will probably refer to him as Holzer throughout this argument for sake of simplicity. We need to remember that the appellant, Jones McNamara, was a four-month employee who was terminated at the end of her probationary period in 2010. She waited almost three years to file suit, and the depositions in this case took place in 2014, four years later. Appellant's counsel has argued with regard to the pause declarations, and I think that's something we need to look at as a court, as was brought up. The pause never worked for Holzer. Their affidavits, actually they're not affidavits, they're declarations. The declarations lack foundation and are filled with hearsay. Paragraph 10 on each specifically states, I was told by certain individuals that the purpose for providing the gifts was to get the ambulance runs, etc. So what was their relationship? What was their relationship? What was their relationship to this litigation? None. Their relationship to any of the parties or to the ambulance companies? They worked for the ambulance company, and they filed a key tam action against the ambulance company, which was filed under seal. In 2013, that case was dismissed, and a seal was released, and that's when they figured out the pause were involved. There was a 154-count complaint filed by the pause against Life Ambulance in which Holzer was mentioned in three or four counts. Jones-McNamara never met the pause until 2014 when the depositions of this case were taking place. She had no knowledge of the pause, anything related to the pause, or any of these allegations. Why does that matter, though? Well, Jones-McNamara is trying to bootstrap in allegations from the pause that made against their employer, not Holzer. They're taking the hearsay testimony from third parties as the intent to induce Holzer. Well, suppose hypothetically, and I am making up this hypo, but suppose hypothetically that the pause say, we know that Life Ambulance was making kickbacks to the key people at Holzer. That would verify McNamara's theory that there was an unlawful kickback scheme in violation of the False Claims Act. Hypothetically, I understand you're going to tell me it's not true, but hypo. Why wouldn't that show that she actually, after the fact, had a basis for her hunches, which she was sort of developing by seeing all these jackets that people had and realizing who was paying for the hot dogs and so forth, that she had really uncovered the tip of the iceberg? Well, two points, Your Honor. The first point is she never saw a jacket. The first time a jacket was seen was by Dr. McInnes in the deposition of Dr. McInnes. And it was described as a band-like jacket. 80s high school bands, that type of thing, cost about 20 bucks. The second thing is the only other thing she knew about were hot dogs. May 18th and May 19th, there's a flurry of emails that you've seen in the record, going back and forth, back and forth. A couple points. One, it was an employee health and wellness event for Holzer. She refers to it as a relay-for-life event. A relay-for-life event is a non-Holzer event that has nothing to do with Holzer, which she admitted in her deposition would be entirely proper for white families to provide hot dogs for. So management wasn't even sure what she was talking about in these emails because they were confusing. Regardless, she went to Mr. Saunders, said we have a violation. Then she would say, we don't, I need to still investigate, back and forth, back and forth. Ultimately, she specifically allowed the event to go forward on May 19th, 2010. She's a corporate compliance officer. She had the authority to stop the event. She chose not to. At the end of this, she did not feel, and she testified, that Mr. Saunders did not impede her investigation in any way. In fact, on May 19th, after she allowed the event to go forward, she nominated Mr. Saunders for an award for his support of the corporate compliance activities at Holzer Medical Center or Holzer Health Systems. So it's all red herring. There is absolutely no evidence she knew of anything at Holzer at the time she was terminated other than hot dogs, which she specifically allowed to go forward, and the allegations of a jacket, which she never saw. She never asked Dr. McInnes to return, and she never saw any evidence of it. There's nothing in the record. When did Saunders send the do-not-put-anything-in-writing email? Well, he spoke with her. Okay, so he didn't put it in writing. No, and she acknowledged, yes. On May 18th, they have a meeting, and she says, definitely, we have a kickback violation. So he meets and tells me, what's going on? I want to know about this. And she says, it's not as bad as it seems. I need to still investigate. And this is in Mr. Saunders' deposition testimony. Then the next morning, he says, don't put final conclusions in writing until you finish your investigation. He never told her not to put conclusions in writing. He just said, don't put final conclusions in writing. The very next morning, there's a reference that says, B.S. and I just met, Brent Saunders, something to the effect of, he asked me to not put things in writing or something like that. However, there is a kickback violation, which I'm still investigating. Did exactly the same thing the next day on May 19th. Then ultimately allowed the hot dogs to go forward to the hospital. Were the depositions in the summary judgment record? Yes, yes. And the key component also is, PNF has never established causation. There's never been any relationship between any alleged protected activity and her ultimate termination. We need to look at the timeline for this. First of all, PNF alleged direct evidence of retaliation. She has never set forth a prima facie case for indirect evidence of retaliation, both in the district court and in the Sixth Circuit. We argue that's waived. Regardless, no such evidence has ever been raised of a prima facie case. She's put all her eggs in the direct evidence basket. The two instances of direct evidence are, one, an email by Brent Saunders after the fact on August 5th, 2010, after she was terminated. It's a deceptively phrased email, as he says in his brief. It's from Cindy Bourne to Lisa Halley, not by Brent Saunders. Never references her termination. Never references any adverse action. Specifically states he never impeded her investigation. But what it says is, I asked her not to put final conclusions in writing until the investigation has been completed, and she never completed the investigation. The second direct evidence is that of Jim Phillippe, the former president of Holzer. And Mr. Phillippe specifically stated, I did not make the decision to terminate. Excuse me. I was not involved in the decision to terminate. Excuse me. I was only told of it by Mr. Saunders, some of the reasons that he may have made that decision, but I am speculating. So, he did not know. It was hearsay. It was speculation. That's the direct evidence. The District Court below properly found that does not support a finding of direct evidence of retaliation. If anything, it's indirect. Also importantly, with the lack of causation, Holzer set forth eight legitimate non-discriminatory reasons for termination. Significantly, plaintiff agreed with the factual basis of every single one of them. She does not deny the factual basis of any of those reasons. Plaintiff's counsel now says we had a duty to tell her about them before we fired her. There is no duty under federal or state law to inform an employee or give them a warning before they terminate. Plaintiff admitted she was an employee at will under Ohio law. As such, there is no such duty. The eight legitimate non-discriminatory reasons are one, there was difficulty in her providing an original application. When she was hired, she faxed in the application in June of 2010 after this incident on May 19th. She asked, HR asked, can we have the original please? Email after email saying it would take six months to get it to them and all that stuff. Were these various reasons communicated to her at the time of her firing? No. So doesn't that make an argument plausible at least that they're made up reasons after the fact? I would respectfully disagree, Your Honor, in that she's agreed that each of these incidents took place. She's agreed she cannot remember her supervisor's first name. Yes, but we all know that some of us have troubles with remembering names. And if that isn't stated as a reason for firing, you might think that that's really just latching on to a little weakness that somebody has but it's not a fireable offense. Like I might not remember your name unless I look at my little sheet. I understand. But that doesn't show that I'm a horrible employee. Well, that would be imposing a duty on the employer to give reasons before termination that does not exist under state or federal law for one thing. No, but we're trying to think are the employer's reasons pretextual or not? And I would argue they are not because, first of all, they're factual. Second of all, they're true. There are emails where she said she was trying to conceal where she lived in all caps. The corporate compliance officer did not want an organization to know she lived in Ohio. It's an email. She admitted her deposition. She didn't know why she sent this. So those reasons, yes. And I would argue also that plaintiff knew at the time she was terminated not all those reasons were given to her. It was simply this is not going to work out. She was offered a severance agreement like many employers would to try to end this situation. But after the fact, she knew the reasons. And those reasons can't be on the record because it was communication on counsel. Some of the reasons seem a little bit artificial. So the idea that she said hello and introduced herself to the same person twice. You could criticize a new compliance officer or a new management type for not introducing herself to each employee that she met once. But here she's made a mistake of introducing herself twice. I mean they seem awfully far-fetched as reasons to fire a person. I would agree that there may be some circumstances that in and of themselves may not be a reason to terminate someone. Introducing somebody three times in a row, not disclosing their brother worked there. But when you have all eight reasons and you have a probationary period where you're trying to figure out whether or not the individual is going to be a good fit for the organization, basically at that time whether or not there was a timeline within Holzer's organization, you had to decide whether or not it's a good fit. And Mr. Saunders decided that this individual is not a good fit for all eight of those reasons. We have to look to the cumulative effect of all those reasons. And the cumulative effect of all those factual reasons for which she does not deny the factual basis. She was calling Lisa Halley, the HR manager, she admits she probably called her a bitch. She admits she did not get along with Lisa Halley, another vice president at Holzer. Was calling another employee a bitch one of the eight reasons? One of the eight reasons was failure to get along with others. There's a real difference between that. I understand that in a civilized employment situation, calling a coworker a bitch is inappropriate behavior. But I didn't see that as a, I thought it was just a more general statement as opposed to expressly saying. The record is not that she said it specifically to her while at work. She admits she may have referred to her as such while at work. Mr. Saunders testified that Sally Jones-McNamara could not get along with some of the workers while at work. So he had trouble getting along with coworkers. She did, excuse me. That was one of the reasons. She couldn't complete an investigation. That was one of the reasons. Her communication skills were lacking. She sought to conceal that she lived in Ohio with an email. She could not, they had trouble getting her in an executive suite or the office in the C-suite. She wanted to be in there. The first office they found wasn't good enough. The second office, she said, well, how about Theresa Remy's office and other VPs? She got upset. In four months, there was a lot of turmoil caused by this individual. Was she terminated during the probationary period? At the end of the extended probationary period. So that is during the probationary period? Yes. So the probationary period was how many months? Well, there was a 90-day probationary period, which was extended 30 days. At the end of that 30-day extension is when the decision was made to terminate by Brent Saunders. Did she know that it was extended? She did know it was extended. She admitted in her deposition that she was told that her probationary period had been extended. And was she given a reason why it was extended? Not at that time. And the May 18th to 20th events, did those occur during the 90-day probationary period? Yes, they did. And many of the events that led to her termination occurred in June. The probationary period ended at the end of May of 2010. So you had some events that happened in May of 2000 or below, and then June also. You had the difficulty obtaining the original application in June. You found out she was actively concealing where she worked. So getting back to the False Claims Act claim, the claim is that there were kickbacks being paid by the ambulance company that was getting all the business or 90% of the business. How did that violate the False Claims Act? What's the theory there? Well, we do not believe there were any kickbacks. But assume that there were. Assume that the jackets, et cetera, were kickbacks. They were being given to hospital employees. Well, there's no evidence that there were jackets given to the hospital employees. Right, I understand. Hypothetically, then, how would that violate the False Claims Act? Well, Life Ambulance, if they were trying to induce Holzer to provide ambulance services. Let me back up. Holzer did not bill for ambulance services. Life Ambulance did. So Holzer never received a direct economic benefit from ambulance services. So Life Ambulance, if they were trying to induce Holzer to provide runs, that would be on Life Ambulance would be violating the False Claims Act by trying to induce Holzer. In order for Holzer to be liable, they would have been soliciting bribes or soliciting the inducement, in this case, evidently of hot dogs, to provide the ambulance services. And so that hot dogs would have had to have led to increased ambulance runs. And that would be simply because Holzer wanted to benefit its own employees with this side freebie kind of thing. What I'm trying to get at is, is there some certification that Holzer makes for Medicare, Medicaid, or some other federal purpose? Because the False Claims Act is false claims against the government, right? Yes, there is a certification that they're complying with the federal laws, yes. So it's just the general certification that Holzer makes that Holzer is complying with the federal laws? Yes, yes. And I've taken you beyond your red light. Thank you. Thank you. Thank you, Your Honor. Could you answer that last question? What exactly is the false claim against Holzer? First of all, the Affordable Care Act makes a kickback automatically a violation of the federal false claim. But it's a kickback that the life ambulance company is making to individuals who happen to be Holzer employees, right? The anti-kickback statute makes it a violation whether the money goes in one direction or goes in the other direction. If one induces, if one solicits, if one encourages a kickback, makes it possible, if one receives the benefit, if one gives the benefit, if one makes the referral, if one receives the referral, in all of those instances, those are violations of the anti-kickback statute. So the key is the person at Holzer who signs the contract with life ambulance? That is part of it. One of the questions that we had was why were all these preferred provider contracts going to life ambulance as opposed to some other ambulance companies that are actually closer and could have provided better service? Well, you don't know that, and that's not in the record. And, you know, that's the problem I have. For all I know, and I don't know, we're just type of that. Life ambulance may have better facilities. They may have better trained people. They may be more efficient. They may be whatever. I don't know. Actually, it is in the record, Your Honor. It is an e-mail from that same Tina Baker that I mentioned before, and this is what she's saying in an e-mail to Mrs. McNamara when she's reporting these kickbacks. MedFlight, that happens to be a competitor. MedFlight 3, Wellston, 21.6 nautical miles, straight line, and 12 minutes, 57 seconds flight time, we're talking about helicopters, to Holzer Medical Center. Life Air 2 is on the other side of Shillikoth, 48.2 nautical miles in 28 minutes, winds and weather not factored into these times. As you can plainly see, Life Air is more than double the distance and time. This is a health issue as well as a money issue. And your red light is on, so we've taken you beyond your time as well. Thank you. Thank you both for your argument. The case will be submitted, and the clerk may adjourn court.